UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 25-165 (DWF/DLM)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| v. | ) | **POSITION** |
| | ) | |
| ABDISATAR AHMED HASSAN, | ) | |
| | ) | |
| Defendant. | ) | |

In 2024, then twenty-two-year-old Abdisatar Ahmed Hassan became convinced by expert ISIS recruiters and online rhetoric that he needed to leave his family, his home, and his country to join ISIS in Somalia. On December 13 and December 29, 2024, he attempted to fly to Somalia. His first attempt failed because he did not know he needed a visa. His second and final attempt failed because he was stopped by law enforcement. Those attempts are the factual bases for this conviction. However, as discussed below and in his letter to the Court, there are other actions by him that the government argued at his detention hearing are of concern.

Why would a twenty-two-year-old be willing to give up everything he knew and loved for an almost guaranteed death? The reasons are myriad, but when boiled down to its essence, the root cause was to be a good Muslim preached by online ISIS recruiters. Because of his age and depression at the time, Abdisatar was easy to groom online.

Today, twenty-three-year-old Abdisatar Hassan will stand before this Court for sentencing. He has been in custody since February 27, 2025 and lots has changed for the better for Mr. Hassan.  Mr. Hassan's advisory guideline range is well above the statutory maximum of 20 years. Because of his age at the time offense, his lack of violence, his lack of belief in ISIS ideology, other similarly situated defendants, and post arrest behavior, we respectfully request a sentence of five years' imprisonment followed by ten years of supervised release.

## GUIDELINES AND STATUTE

The Plea Agreement and the PSR did not differ in their calculations. The total offense level is 37, the criminal history category is automatically adjusted to VI and the advisory guideline range is 360 to life. The statutory maximum penalty is twenty years which makes the advisory guideline range 240 months.  The PSR finds the supervision term is from five years to life.

## OFFENSE CONDUCT

### A. The What

Mr. Hassan has pled guilty to Attempting to Provide Material Support and Resources to a Designated Foreign Terrorist Organization (ISIS) under 18 U.S.C. § 2339(B)(a)(1) from December 13 and 29, 2024.

Mr. Hassan's story does not begin in December 2024, but rather much earlier. Mr. Hassan lived in Texas with his father, stepmother and brother until early 2023. The family then moved to Minnesota. This was yet another adjustment for Mr. Hassan, who

had moved from a refugee camp in Kenya to Texas, was isolated during COVID, and then moved to city where he didn't know people. He started community college, work, and joined a gym. All of the socializing was very good for Mr. Hassan. But things took a turn in the fall of 2023. First, he was no longer able to pay for his fees at the boxing gym, so he quit. He lost his job at Amazon in Shakopee in October 2023. He dropped out of school. And then October 7, 2023 happened. Mr. Hassan remembers he was completely emersed in the news. He saw video after video of the destruction in Palestine. He tried to talk to the few friends he had about the conflict, but his friends didn't seem to care. His family told him to quit talking about things that didn't concern him. Already, Mr. Hassan was feeling very depressed and now he felt isolated from his family and friends. So he turned to social media. At first, the social media he saw was just about the conflict and protests around the world. Then he began seeing terrorist organizations such as ISIS and Al-Shaabab speak on the matter. The message was clear from both – to be a good Muslim, you must not live on land that supports this conflict. One click led to his Instagram and Twitter page being filled with similar messages. His family recalls that Mr. Hassan stopped talking around the house and always had his phone in his hand. By the Spring of 2024, Mr. Hassan was reposting videos he had seen and or commenting on such links. If an account was shut down, he reopened it under a different name. He lost weight. By this time, he had found another job, but he did not go back to school or the gym. Mr. Hassan recalls he felt significant sadness all the time in 2024. A year later, in October 2024, he had been convinced by ISIS members to join ISIS in

3

Somalia. And he began to make plans. He gave his notice to his employer and asked to close his 401K account that had $1200.

This behavior was all surrounding the events of October 7, 2023. Prior to October 2023, there were no negative posts by Mr. Hassan. In fact, he traveled to Kenya in 2021 and there was no attempt to travel to Somalia to join ISIS or Al-Shaabab.

On December 13, 2024, Mr. Hassan attempted to travel to Somalia to join Somalia ISIS. However, Mr. Hassan did not have a travel visa and was denied a boarding pass. On December 29, 2024, he attempted to travel to Somalia for a second time, but was stopped by Customs and Border Patrol in Chicago. He admitted to officers that he supported ISIS and used social media. He was not arrested, but rather sent back to Minneapolis. Upon returning to Minnesota, Mr. Hassan made no further attempts to travel to Somila to join ISIS. He did not attempt to flee the jurisdiction. Rather, he asked for his job back, and started back at his place of employment. Unfortunately, Mr. Hassan was still suffering from isolation and depression. He continued showing his support for ISIS in January and February 2025 by posting and commenting on ISIS activities on social media. He was arrested on February 27, 2025 at his job. He did not attempt to run or harm anyone. He has remained in custody since his arrest. So why did this happen?

### B. The Why

Mr. Hassan's family was shocked when the FBI notified them of Mr. Hassan's attempts to travel to Somalia. As more information was released at the detention hearing, the family couldn't believe what they were hearing about Mr. Hassan's social

media posts. However, looking back, they now see the signs. They recall how Mr. Hassan isolated himself and stayed on his phone constantly. They recall his "obsession" with Israel and Palestine. They recall that the happy guy they knew disappeared in 2024.

Mr. Hassan isn't sure what he would have done once he arrived in Somalia and joined ISIS. He recalls he just felt that someone was listening to him. When he talked about the war crimes in Palestine and that it was wrong that the world was not doing enough to help Palestine, ISIS listened.  ISIS recruiters know how to play the role of a listener. ISIS posted videos and called out to young Muslims living aboard.  Violent extremist recruiters provide concrete - and often simple - answers to complex questions about how a young person, typically a young man, can find his place in the world.  The answers recruiters provide are accepted without question or reservation because they seem to make sense of an otherwise convoluted awareness of self.  ISIS is notorious for its sophisticated understanding of propaganda.  ISIS propaganda machine includes an entire production company dedicated  to  western  audiences. ISIS has its own recruitment manual on how to recruit depressed lonely high school and college boys. Mr. Hassan was groomed, and he eventually, a year after being sucked in by ISIS, attempted to join ISIS in Somalia.  He was perfect target: young, depressed and alone. Social media along with an undeveloped mind made Mr. Hassan a perfect recruit.

## SOCIAL MEDIA

### A.    Social Media's Role in the Offense

Mr. Hassan entered this landscape of far-reaching, sophisticated propaganda at a troubled time of his life, making him a prime target for the radicalization of young men ISIS-Somalia needs for it to survive. At the time of falling prey to online radicalization, he was facing unemployment and intense feelings of isolation in the Twin Cities.  Mr. Hassan had overcome many hardships: living in a refugee camp, moving to a foreign country, being separated from his mother, and having difficulty in school. But still, he overcame, graduated from high school, and maintained stable employment throughout most of his life. However, all that progress came to a halt when Mr. Hassan was exposed to graphic images of violence on the Internet emerging from the Israel-Palestine conflict.

Social media made access to suffering easy and inescapable, leading Mr. Hassan to fall into a never-ending rabbit hole where he constantly fixated on the suffering caused by the war overseas. He dropped out of college, lost an unhealthy amount of weight, and withdrew from his family. Through all of this, Mr. Hassan felt alone.  The same social media spaces that were triggering his depression also became the only places where he felt he could find community.

1. **The history and power of social media to radicalize young Muslim men**

Unfortunately, Mr. Hassan's story is not unique. Empirical studies show that people are more vulnerable to social media influence when they are already struggling with feelings of disenfranchisement in their community. Christopher Ferguson, *Does the Internet Make the World Worse? Depression, Aggression and Polarization in the Social Media Age*, 41 Bulletin of Science, Technology, & Society 4, 118 (2021). The same study shows that social media can also drive aggression, whether ideological or non-ideological. *Id.* at 129. Men specifically who already feel emasculated by their social situations can then turn to social media to make ostentatious assertions of their masculinity, thus showing off for the approval of other men. *See* Timothy Piatkowski et al. *The impact of social media on self-evaluations of men striving for a muscular ideal* 49 Journal of Community Psychology, 2, 733 (2020). Especially for Muslim men in the U.S., radicalization can occur due to feeling unable to assimilate into American culture. Angela McGilloway et al. *A systematic review of pathways to and processes associated with radicalization and extremism amongst Muslims in Western societies* 27 International Review of Psychiatry 1, 49 (2015).

A general discontent with foreign policy or an abstract feeling of isolation will then drive young Muslim men onto online spaces for validation from other disaffected men. Even where feedback from peers is negative, harmful to self-

esteem, and deepens the user's inclination toward risky behavior, male users continue to enter these digital spaces in search of any community at all. Piatkowski, *supra* at 734. Men entering into parasocial online relationships to cure their depression get trapped in a self-fulfilling prophecy; the digital communication only worsens their depression and feelings of inadequacy, which then increases their social media usage, which then makes them more likely to act in the real world in addition to behaving badly online. Zac Seidler et al. *Virtual connection, real support? A study of loneliness, time on social media and psychological distress among men*, 68 International Journal of Social Psychiatry 2, 291 (2020).

Sophisticated online content producers know of this self-destructive cycle and use their presence to specifically target young men who show signs of discontent online. *See* Brock Wilson, *'It's a slippery slope': How young men fall into online radicalization*, CBC News, (Sept. 19, 2022) https://www.cbc.ca/news/young-men-online-radicalization-1.6585999. The development of online algorithms has become an inescapable element of modern life. Robert Donoghue. *Freedom under algorithms: how unpredictable and asocial management erodes free choice*, 8 Frontiers in Artificial Intelligence, 1 (2025) ("[Algorithms] are used to administer welfare and social services, determine prison sentences, structure our social media engagements, detect banking fraud, and direct police deployments, among numerous other functions.").

8

Algorithms weaving their way into our daily lives robs every one of the need to exercise foresight or discernment when consuming content because everything is chosen for us based on the appetites of whomever developed and paid for the algorithm to reach us. *Id.* at 12. Similarly, algorithms disrupt social relationships because people whose critical thinking skills have been hijacked by algorithms do not know how to engage in "a continuous exchange of information rich communication" which further their ability to engage with new information that may disrupt the ideologies the algorithm thrust upon them. *Id.* Ultimately, it is not enough to ask who is consuming the algorithm-driven slate of content, because the harsh reality is that all of us are part of an algorithm. Rather, "[w]hen algorithms cause moral havoc, as they often do, we must look to the human beings who designed, programmed, commissioned, implemented, and were supposed to supervise them to assign the appropriate blame." Carissa Veliz, *Moral zombies: why algorithms are not moral agents*, AI & Society 36, 496 (2021).

For Mr. Hassan, the human beings who curated the content he consumed were part of ISIS-Somalia. ISIS and its predecessor radical groups have leveraged the Internet to radicalize young men across the world for roughly two decades.

The history of Internet radicalization techniques shows that Mr. Hassan's path before the Court for sentencing is well-trodden. He felt passionately about the Israel-Palestine conflict that began in October 2023. PSR ¶ 7. He felt pained by

constantly seeing fellow Muslims being killed all over his social media feed. *Id.* But, for men whose ISIS' algorithm targets, even a passing or altruistically-held political concern is exploited for the terrorist group's material gain. *See* McGilloway et al., *supra* at 50. The feelings of despair at seeing images of death and destruction, coupled with his own struggles with unemployment, led him to spending all his time on social media. He then began to engage in flashy demonstrations of his masculinity online, such as shooting a gun at a practice range or reposting executions to show off for a parasocial community. PSR ¶ 7; *Cf.* Piatkowski, *supra.* (arguing that men who feel disenfranchised attempt to aggressively flaunt their masculinity online.).

Mr. Hassan was then exposed to the ample online materials that ISIS and other terrorist groups have produced online. PSR ¶ 11; 14. All of this Internet activity coincided with actual ISIS members reaching out to Mr. Hassan. PSR ¶ 17. This all culminated in him purchasing a one-way ticket to East Africa PSR ¶ 9. The propaganda machine that ISIS has fine-tuned for over a decade had claimed another disaffected young man. As the PSR articulates, "[t]he radicalization process can occur quickly." ¶ 96. A man who had found his way out of a refugee camp, who had been dazzled by availability of food in America, and who had forged a stable life in the U.S. was just another recruit in ISIS' eyes to keep their floundering presence in Somalia afloat.

But ISIS lied to Mr. Hassan. They told him they were the good guys, that they were able to stop the suffering he was seeing on social media, and that they would make him feel happy again. ISIS had no intention of fulfilling any of those promises; to them, Mr. Hassan would have become another cog in their fundraising and propaganda machine. Social media actively dampens critical thinking. It convinces young men that whatever biases they hold must be true and anyone who tries to tell them otherwise must be an enemy. *See* Veliz, *supra* at 496. And for twenty-two-year-old Mr. Hassan he believed what he was told by ISIS.

### YOUTH

Under 18 U.S.C. § 3553(a), the overriding objective of a sentencing court is to "impose a sentence sufficient, but not greater than necessary," to satisfy the traditional and statutory purposes of criminal punishment. To this end, a sentencing court is tasked with considering a number of statutory factors which inform the inquiry, including: (i) "the history and characteristics of the defendant," § 3553(a)(1); (ii) "just punishment for the offense," § 3553(a)(2)(A); and (iii) "to provide the defendant with needed * * * correctional treatment," § 3553(a)(2)(D). All of these § 3553(a) factors—and others as well—call upon a sentencing court to consider the defendant's youth at the time of the offense conduct. *See, e.g., United States v. Feemster*, 572 F.3d 455, 459-60 & 462-64 (8th Cir. 2009) (upholding major downward variance—from 360-month advisory term to 120-month term

11

imposed—based largely upon defendant's youth at the time of offense conduct (age 26) and at time of prior offense conduct (beginning age 17)).

The rationale for considering a defendant's youth when conducting the § 3553(a) analysis is, in large measure, the product of common understanding and judicial experience, *i.e.*, "youth is wasted on the young" such that many a youthful offender may be redeemed with the opportunity for accumulation of "a little wisdom." *Id.* at 459. Of late, courts have increasingly bolstered these traditional rationales, incorporating scientific and empirical data into the analysis. This can be seen, for example, in the Supreme Court's line of Eighth Amendment cases, as applied to defendants who were under age 18 at the time of offense conduct. *See, e.g., Miller v. Alabama,* 567 U.S. 460, 471-72 (2012).

In the § 3553(a) sentencing context at issue here, the term "youthful offender" is not limited to persons who were under age 18 at the time of offense conduct. *Feemster,* 572 F.3d at 459-60 & 462-64 (major downward variance, in large measure due to defendant's relative youth of age 26 at the time of offense conduct). And as above, it is appropriate for a sentencing court to supplement its common experience with brain science and empirical data relating to such youthful offenders, when warranted. *United States v. Ramsay,* 538 F.Supp.3d 407, 423 (S.D.N.Y. 2021).

In this case, Mr. Hassan was twenty-two years old at the time of the offense conduct. This places him squarely within the category of a "youthful offenders," as defined by the United States Sentencing Commission. USSC, *Youthful Offenders in the Federal System*, at 1 (May 2017) (presenting "information about youthful offenders, who for purposes of this report are  defined as persons *age 25 or younger* at the time they are sentenced in the federal system").[1] The extension of the term "youthful offender" to a person who committed an offense in his mid-20s is not some arbitrary designation, but rather supported by neuroscience and other empirical evidence. *Id.* at 6-7. Evidence which continues to be replicated and expanded upon, in study after study. *See, e.g.,* Nat'l Acad. of Sci., Eng'g & Med., *The Promise of Adolescence: Realizing Opportunity for All Youth*, at 1 (2019) (defining "adolescence" as a critical period of brain development, "beginning with the onset of puberty and ending in the mid-20s").[2]

More recent research casts doubt upon the criminological efficacy of imposing lengthy prison terms upon youthful offenders,[3] notes the adverse

---

[1] https://www.ussc.gov/research/research-reports/youthful-offenders-federal-system

[2] https://nap.nationalacademies.org/catalog/25388/the-promise-of-adolescence-realizing-opportunity-for-all-youth

[3] https://www.sentencingproject.org/reports/why-youth-incarceration-fails-an-updated-review-of-the-evidence/

outcomes associated with the same,[4] and observes the broader societal costs of depriving youthful offenders of opportunities for personal development during a critical stage of life.[5]

The question may then arise, how best to account for the defendant's youth, when applying the § 3553(a) factors? At least one court has effectively surveyed the above case law and other authorities, and offered the following:

1. *Immaturity.* The extent to which the defendant evinces a "lack of maturity and an underdeveloped sense of responsibility," resulting in "impetuous and ill-considered actions and decisions," which might be expected to fade as the person advances in age.

2. *Susceptibility.* The extent to which the defendant's actions may be said to have stemmed from a youthful person being "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," which again might be expected to fade with advancing age.

3. *Salvageability.* The extent to which the defendant's actions may be said to have been grounded in "transitory" personality traits of a not-fully-developed mind, requiring consideration that "their youthful character deficiencies will be reformed."

4. *Dependence.* The extent to which the defendant's actions may be explained by the environment in which he was born and raised, such that a change in environment might alter his trajectory.

---

[4] https://publications.aap.org/pediatrics/article-abstract/139/2/e20162624/60093/How-Does-Incarcerating-Young-People-Affect-Their?redirectedFrom=fulltext

[5] https://www.annualreviews.org/doi/pdf/10.1146/annurev-lawsocsci-101317-031101

*Ramsay,* 538 F.Supp.3d at 417-23.

Mr. Hassan was twenty-two years old when he was influenced by social media posts by ISIS recruiters. Given his age and depression, it was easy to influence and sway him by playing the "its your duty" "it is your duty as a Muslim" "it is your duty as Muslim man" to leave the United States. He was highly susceptible and immature. He attempted to travel twice – once without a visa and with limited cash. After his second failed attempt, he was still depressed and isolated and continued to find comfort on social media. This led to posts and likes on social media.  Since his arrest and since he started programming, he has changed. As his brain ages, he is looking at his life in a different lens. At age 23, he is still very young and he has attempted to correct his behavior by pleading guilty. Today, his trajectory has changed. It has changed for the better.

## SOCIAL MEDIA and YOUTH

As has been amply demonstrated above, the addictive nature of internet-based social media appears particularly acute among young people whose incomplete brain development renders them especially vulnerable to the development of addictive behaviors around their near-constant, compulsive consumption. However, this is not merely attributable to young people and their respective brain development.

15

Earlier this year, a jury found Meta, Inc. – the parent company of Facebook and Instagram, two prominent social media portals used by Mr. Hassan – legally liable for designing their products to be as addictive as possible to generate increased screen time and engagement. *See e.g.,* Ceclia Kang et al, *Meta and YouTube Found Negligent in Landmark Social Media Addiction Case,* https://www.nytimes.com/2026/03/25/technology/social-media-trial-verdict.html (last visited April 14, 2026). This landmark verdict, likely a harbinger of additional accountability by social media companies, establishes that the pernicious nature of social media consumption is amplified at both ends of that dynamic: the adolescent consumer's physiological immaturity and the content provider's capitalistic machinations to build maximally addictive platforms. These mounting concerns grounded in real world consequences have prompted independent but simultaneous efforts around the globe to limit young people's access to social media. *See e.g.,* Christine Chen et al, *From Australia to Europe, countries move to curb children's social media access,* https://www.reuters.com/world/asia-pacific/australia-europe-countries-move-curb-childrens-social-media-access-2026-04-08/ (last visited April 14, 2026). This groundswell illustrates the breadth and depth of the problem at hand and the various ways by which communities are seeking to mitigate the now-undeniable harm caused by unchecked social media consumption by adolescents specifically.

16

Given social media's role in the offense and Mr. Hassan's young age, a downward variance is warranted in this case. But the Court should also understand Mr. Hassan's growth over the last year.

## EMOTIONAL GROWTH

Because Mr. Hassan is facing twenty years in prison, it may seem convenient to say he no longer believes in ISIS ideology. But that is the truth. Mr. Hassan has had over a year to reflect on his behavior and thinking. He has read many books about how to peacefully protest. He has taken educational and mental health courses online at jail. He has attended therapy groups in jail. He has talked to a former ISIS fighter at Sherburne who described the lies ISIS tells Muslims. He has for the first time, told his family about his depression and loneliness. He has a plan for his future. Mr. Hassan is not the same person that appeared in Federal Court in February 2025.

Luckily for Mr. Hassan, this federal prosecution has woken him up from that daze and he can now see through the lies fed to him by the ISIS algorithm.

He now understands how all this radicalization happened to him:

> I was in a vulnerable position in my life where I was unemployed and with limited few friends in a big city that I was still new to, I turned to social media for company. I started looking more and more about the Gaza/Israel war and it went downhill for me and before I knew it, I was communicating terrorists on social media. Due to this, I attempted to travel and join Isis.

17

PSR ¶ 17. He also now sees the error of ISIS' ways and how they were never going to bring about the change he genuinely cares about:

> I am committed to growing from this experience and moving forward with integrity, gratitude, and a renewed focus. I want to engage in learning about civics more and to see peace around the world and not promote more violence. I am learning how to express myself without joining a terrorist group. That may sound stupid, but that was my reality. I want to end by apologizing to the U.S. I am sorry if I scared any citizens. I Never wanted to harm anyone here or in Somalia. I didn't think about the consequences of my words + it was easy to take my frustrations on social media.

*Id.* Mr. Hassan's choices were major and harmful, but at the same time he made the choice to begin unlearning all the lies he had believed. Deradicalization can be a long process that forces people to retrain the critical thinking muscles social media algorithms destroy. PSR ¶ 96. However, Mr. Hassan has already made great strides in seeing through the lies ISIS sold to him. He now knows how to reconnect with his real community, his family, and his personal values rather than seeking validation from dangerous entities online.

### SENTENCING FACTORS SUPPORT A DOWNWARD VARIANCE

Since *Booker*, sentencing courts have been called upon to fashion a sentence that not only encompasses the facts and circumstances of the offense, but addresses the history and characteristics of the offender as well. *See, e.g., Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances

18

of the offense together with the character and propensities of the offender").
(*quoting Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)).

## A.   Overstated Criminal History

The PSR accurately reflects the reality that, prior to the offense of conviction here, Mr. Hassan has a clean record. PSR ¶ 33. No adult charges or convictions. No juvenile charges or adjudications. No criminal history at all. And yet, under the Guidelines, Mr. Hassan has been assigned a criminal history category (CHC) VI, PSR  ¶ 33, the highest one possible, and corresponding to the most elevated array of advisory sentencing ranges.

The reason for this anomalous outcome—*i.e.,* a defendant with a clean criminal history being assigned the highest USSG criminal history category—lies with USSG § 3A1.4(b), the terms of which call for indiscriminate use of CHC VI in all situations involving a "federal crime of terrorism" as defined by federal statute. USSG § 3A1.4 & App. N. 1, 3 (citing to, *inter alia*, 18 U.S.C. § 2332b(g)(5), which cross-references the statute of conviction at issue here).

However, the Court is not bound to any such Guidelines-driven anomaly, and instead is authorized to impose a downward-variance under the 18 U.S.C. § 3553(a) traditional sentencing factors. *United States v. Gall,* 552 U.S. 38, 46 (2007). A district court is to impose a sentence that is "sufficient, but not greater than necessary" to "serve the four overarching aims of sentencing," as reflected in §

3553(a)(2)(A)-(D). *Dean v. United States*, 581 U.S. 62, 67 (2017). "Traditional sentencing factors often involve * * * characteristics of the offender," such as "recidivism" (or lack thereof) as reflected in a defendant's criminal history. *Castillo v. United States,* 530 U.S. 120, 126 (2000).

"A district court has substantial leeway in deciding how to weigh the § 3553(a) factors[.]" *United States v. Sholds*, 827 F.3d 758, 760 (8th Cir. 2016). And a sentencing court is permitted to vary based upon conduct that spans across § 3553(a) factors, such as the nature and circumstances surrounding a defendant's criminal history. *United States v. Feemster*, 572 F.3d 455, 463-64 (8th Cir. 2009). Moreover, a district court may reject an advisory Guidelines range entirely in the § 3553(a) analysis; particularly when the Guideline provision is of doubtful provenance, or where the facts do not constitute a "mine-run" or "heartland" case contemplated by the Guideline(s) in question. *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

Here, as noted above, operation of USSG § 3A1.4(b) calls for the highest criminal history category, even though Mr. Hassan has no pre-offense criminal history at all. (PSR ¶ 33). And § 3A1.4 does so while simultaneously increasing a defendant's offense levels by 12, with a minimum total-offense-level (TOL) of 32. § 3A1.4(a). Thus, no matter a given defendant's individualized circumstances under the § 3553(a) traditional sentencing factors (*e.g.,* lack of criminal history), §

3A1.4 imposes a *minimum* criminal history category VI and TOL 32, corresponding to a minimum advisory range of 17.5 to nearly 22 years for a term of imprisonment. USSG § 5A (sentencing table).

In the present advisory USSG regime, however, any given Guidelines provision is subject to judicial scrutiny to determine whether it is or is not the product of the United States Sentencing Commission's "institutional role," *i.e.,* based upon "empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough,* 552 U.S. at 108-10. If not, then a district court acts well within its sentencing discretion in disregarding the offending provision at the § 3553(a) variance stage, and instead crafting a sentence based upon some reasoned formulation of the traditional sentencing factors. *Id.*

USSG § 3A1.4 falls under the category of Guidelines provisions that finds no grounding in empirical data or national experience, as determined by the Sentencing Commission in its professional and institutional capacity. The provision was first added in 1995 in response to a congressional enactment which called upon the Sentencing Commission to "provide an appropriate enhancement" for any felony involving "international terrorism," and in its original form merely authorized an unspecified "increase [in] the sentence above the authorized guideline range." USSG, App. C, Am. 526. However, the next year Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), Pub. L. 104-132 (Apr. 24, 1996), including one provision which calls for an "emergency amendment" to broaden the scope of covered "crimes of terrorism." AEDPA, § 730; USSG, App. C, Am. 539. The Sentencing Commission did so, but simultaneously and without explanation, also implemented the present version of § 3A1.4, calling for indiscriminate increases in both offense level *and* to maximal CHC, as described above. USSC, *Amendments to Sentencing Guidelines – Interim Publication*, at 5-6 (1996).[6]

Counsel has been unable to uncover literature—from the Sentencing Commission or case law—offering any empirical justification for the dual-dimensional § 3A1.4 enhancement. And in particular, the indiscriminate imposition of the maximal criminal history category, regardless of the defendant's actual criminal history. Nor have sentencing courts, judging by the recent decisions to have examined this same topic. *See, e.g., United States v. Dais*, 482 F.Supp.3d 800, 802-03 (E.D. Wis. 2020) (§ 3A1.4 "was enacted pursuant to a congressional directive and absent empirical evidence," such that it does "not exemplify the Sentencing Commission's exercise of its characteristic institutional role" and hence is "generally entitled to less respect"); *United States v. Alhaggagi*, 372 F.Supp.3d 1005, 1014 (N.D. Cal. 2019) ("The terrorism enhancement is not

---

[6] Available at https://www.ussc.gov/guidelines/archive

backed by any empirical evidence."), *vacated and remanded on other grounds,* 978 F.3d 693, 704 (9th Cir. 2020); *United States v. Jumaev,* 2018 WL 3490886, at *10 (D. Col. July 18, 2018) ("I have two principal objections to this operation of the Terrorism Enhancement. First, it is not backed by any empirical evidence. And second, treating all 'terrorists' alike is impermissible under our sentencing paradigm * * *." (citations and footnotes omitted)).

Beyond this, the criminal-history-enhancing aspect of § 3A1.4 lacks even so much as a sound theoretical grounding. That is to say, terrorism-related offenses are certainly serious in nature, such that one could at least plausibly defend an increase and/or floor in offense levels, as found in § 3A1.4(a). By contrast, the indiscriminate increase to maximal Criminal History Category VI under § 3A1.4(b) lacks any empirical _or_ logical basis. As one court has said:

> [I]t is the _offense level_ that reflects the seriousness of a charged offense. * * * A defendant's _criminal history category_ reflects something different. * * * If terrorism sentences are too low, the Sentencing Commission can recommend increasing the offense level for those crimes. But automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense is inappropriate, as it does not reflect — unlike every other offense — the seriousness of the defendant's previous criminal convictions.

*Alhaggagi,* 372 F.Supp.3d at 1013-14; *accord Dais,* 482 F.Supp.3d at 802-03.

The above observation is quite accurate, under both traditional sentencing considerations and the internal logic of the Guidelines themselves. Prior criminal

history is deemed significant for present sentencing purposes due to "extant empirical research assessing correlates of recidivism and patterns of career criminal behavior." USSG § 4A (introductory commentary). Hence, the Guidelines seek to impose the most punitive sentencing ranges upon those defendants who have amassed prior convictions in unusual large numbers, §§ 4A1.1 to .3, or in unusual seriousness, §§ 4B1.1(b) (career offender), .4(c) (armed career criminal), .5(a)(2) (repeat/dangerous sex offender). However, § 3A1.4(b) radically departs from that same internal logic, imposing the highest and most severe Criminal history category VI upon *any and all* defendants who fall within its scope, regardless of whether the defendant has lengthy criminal history or, as in the case of Mr. Hassan here, none at all.

The above decisions have thus correctly observed the indiscriminate criminal-history-enhancement of § 3A1.4(b) finds no criminological justification. Not in empirical studies. Nor in traditional sentencing considerations. Nor in the internal logic of the Guidelines themselves. Hence, for purposes of a § 3553(a)-variance sentence requested here, Mr. Hassan respectfully requests that the Court begin from a place of objective reality instead of legal fiction, *i.e.,* that prior to the instant offense he has a clean criminal history, and his advisory Guidelines range should be re-calculated for variance purposes to reflect that objective reality.

**B.    Family**

Section C of the PSR details Mr. Hassan's background in detail.  As noted in Section C of the PSR, Mr. Hassan was born in a refugee camp. His family has informed counsel that his birth was very difficult and he was born "blue" due to lack of oxygen. His family was from Somalia but fled during the war and ended up in Kenya. He has two siblings – one lives with his mother in Kenya and the other brother lives in Minnesota. As one can only imagine, being born and raised in a refugee camp was difficult. There was little medical care, little food and water, and no running water in the family shack.

When Mr. Hassan was 12 years old, he moved to Texas with his father, stepmother and brother. It was difficult arriving in an area where others didn't look like him or speak the same language. It didn't help that Mr. Hassan was behind on his education as compared to children his age in the United States. As his father worked long hours, Mr. Hassan did his best with school bullies and his studies. During his last year of school, COVID hit, and he was isolated at home alone while his brother and father worked. Mr. Hassan really missed his mother, and eventually he was able to see her after graduated from high school in May 2021. He enrolled in community college the following fall and withdrew in the fall of 2022. Again, this was during COVID. In early 2023, the family moved to Minneapolis. Mr. Hassan enrolled in college again and again left in the fall of 2023.

25

Mr. Hassan has never used drugs or alcohol. He has worked as a warehouse worker for most of this adult life (Amazon, Tyson foods, and BE Power). He is someone who has always contributed to the household and feels very supported by his family now that he has told them about his feelings.  He just wishes he had told them how he felt before this offense.

## C.      Pretrial Custody at Sherburne County Jail and Wright County Jail

Mr. Hassan has been in custody since February 27, 2025. The jails do not allow any outdoor activity, no in-person family visits, and programming is very limited. This is the first time Mr. Hassan has been in jail. He has made the most of his time and shown growth.

### 1.      Family Support

Mr. Hassan's family, although sad that he is in custody, have noticed a positive change. Mr. Hassan has been able communicate with his family through videos, texts, and phone calls. During these communications, Mr. Hassan has apologized to his family. He has openly talked about his depression, something he had never felt comfortable discussing. The openness by Mr. Hassan reminds his family of the Abdisatar they knew before the offense conduct.

### 2.      Behavior in custody

Ove the last 14-months, Mr. Hassan has had zero writeups at Sherburne or Wright County Jail. He is known by Sherburne County Correctional Officers as

"Happy." This name was given to him because of his excellent behavior at the jail. He helps when asked and does whatever has been asked of him by the Correctional Officers. His kindness has not always helped him at the jail. He was bullied into handing over commissary items to other inmates. Mr. Hassan's theory was that if someone was asking for an item, they must need it more than him. After highly publicized comments were made about the Somalian community in Minnesota, Mr. Hassan dealt with another round of bullying. Instead of being angry, Mr. Hassan talked to counsel about how he felt and what he could say or do to change minds. This shows growth in his thinking. And the growth comes because of what he has learned from programming and therapy.

### 3.  Tablet Courses

Mr. Hassan completed 127 individual certificate programs at Sherburne County Jail. The course content addressed various types of wellness and self-improvement in the areas of career development, emotional health, physical health, interpersonal communication, personal finance, academic skills, cultural awareness, and civic participation and social change.

Mr. Hassan completed 27 certificate program hours related to intentional living skills. These psychology-focused courses taught strategies to nurture and optimize a growth mindset, specifically in the areas of focused attention, goal setting, productivity, emotional intelligence, critical thinking and problem

solving. Course content around mental health and substance use accounted for 15 of the credit hours. Example courses include, "Coping Skills for a Better Life," "Rational Emotive Behavioral Therapy," and Mindfulness Mediation." Nine of Mr. Hassan's coursework supported the improvement of cultural awareness and connection with people across different identities, beliefs, and cultures. Example course topics including, Hispanic heritage month, and replacing harmful language with inclusive language. Mr. Hassan took three courses specific to civil participation and social change. Mr. Hassan completed 10 courses related to technology, including tutorials on various software programs like Adobe and Microsoft, as well as tips to having a safe social media presence. Mr. Hassan completed 27 courses in career development. His areas of interest include marketing, business development, entrepreneurship, and leadership and management. Mr. Hassan received the Academic Skills Certificate which acknowledges his hard work and commitment to completing 130-hours of high school equivalency preparation coursework. Example academic courses include, "study and learning skills for college and university," and "reading skills (nonfiction)." Mr. Hassan took nine courses related to physical health, and eleven courses in personal finance. Lastly, Mr. Hassan completed a 130-hour certificate program specific to navigating community re-entry titled, "Rising STAR reentry

program." In receipt of this certificate, Mr. Hassan "demonstrates and outstanding commitment to personal and professional growth through NCIC."

### 4. Therapy

All of the programming completed by Mr. Hassan has broadened his perspective significantly. He learned to have wider views rather than have narrow views. The courses helped when he joined therapy classes at the jail. (Exhibit 1). His personal growth through coursework was multiplied when he joined therapy classes at the jail, which included a social and interactive dimension to his expanding worldview. The first group session allowed Mr. Hassan to hear from other inmates and receive feedback from the counselors. He has found therapy to be very helpful to his personal growth. In addition to structured programming, Mr. Hassan has found reading to be very helpful.

### 5. Books

Since being in custody, he has read the following books: Crusader Without Violence: The First Biography of Martin Luther King, Jr.; Mahatam Gandhi, A Biography: Peace Through Resistance and Conviction; Just Mercy; Making Plans that Stick: An honest look at the mindsets that keep us Stuck; The Good Citizen: A History of American Civic Life; US Citizenship (includes the citizenship test which Mr. Hassan received a score of 87 out 100). After reading each book, Mr. Hassan took the time to discuss his take aways with counsel. He was able to discuss his

29

opinion about the Israel Palestine conflict and understand how to use his power as a United States Citizen to make his opinion known in a nonviolent manner. This type of education (civics education) has helped many young individuals similarly situated as Mr. Hassan in the past. The last three defendants convicted of Material Support (2 who completed travel and fired weapons) represented by the Federal Defender's Office, all went through similar civic engagement. One defendant completed supervision early, and the other two are doing extremely well on supervision. These cases, along with others, are discussed below.

## D.    Sentencing Disparities

Mr. Hassan's requested sentence is appropriate in comparison to the sentences of other ISIS Affiliates. 18 U.S.C. § 3553(a)(6) recognizes a need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Mr. Hassan's requested sentence is appropriate here when comparing his case to that of these other individuals in terms of the extent of their involvement with and power within ISIS and their accountability and cooperation after arrest.

The PSR in paragraph 74 notes that the average sentence for this crime during the fiscal year 2020-2024 is 172 months. However, this includes all defendants in criminal history VI regardless of if the category includes prior

30

criminal conduct or because the category is by virtue of the guidelines. It also doesn't distinguish between those that completed travel versus attempted travel.

Looking though publicly filed documents and open source, counsel was able to find cases throughout the country. The following table summarizes critical details and information on the ten other individuals who were repatriated and charged with terrorism related crimes.

| Defendant's Name | Case No. | Sentence Length | Relevant Facts |
|---|---|---|---|
| Emraan Ali | 21-CR-20123 (Southern District of Florida) | 20 Years | Mr. Ali was sentenced on March 28, 2023, after pleading guilty to conspiracy to provide material support to ISIS in violation of 18 U.S.C. § 2339B(a)(1). He provided support by bringing his family, including young children, to Syria to join ISIS. He enrolled his 12 and 14-year-old sons as child soldiers for ISIS and married off his 14-year-old daughter to another ISIS soldier. He also trafficked weapons in support of ISIS and helped finance ISIS operations. |
| Jihad Ali | 21-CR-20109 (Southern District of Florida) | 5 Years | Mr. Ali is the son of Emraan Ali and became a child soldier for ISIS in 2015 when he was 14 years old. He joined an ISIS battalion, and, in or around 2018-2019, he fired his weapon on behalf of ISIS against U.S. led coalition forces. He was sentenced on September 30, 2021, after pleading guilty to Conspiracy to Provide Material Support to ISIS in violation of 18 U.S.C. § 371 and 2339B(a)(1). It is unknown whether Mr. Ali cooperated with the government. |

| Xavier Pelkey | 22-CR-50 (District of Maine) | 15 years | Mr. Pelkey was sentenced to 15 years in prison on November 6, 2022 after pleading guilty to conspiring to provide material support to terrorists in violation of 18 U.S.C. §§ 2339A(b), 2332a and 2332b. He conspired with two minors to conduct a mass shooting at a Shia Mosque in the Chicago area and planned to contribute firearms, ammunition, and explosives to be used in the attack. Pelkey was a supporter of ISIS, and a search warrant recovered written statements claiming the planned attack in the name of the terrorist organization. |
|---|---|---|---|
| Ruslan Maratovich Asainov | 19-CR-402 (Eastern District of New York) | Life in Prison + 70 Years | Mr. Asainov was sentenced on October 17, 2023, for Conspiracy to Provide Material Support to ISIS in violation of 18 U.S.C. § 2339B(a), two counts of Provision and Attempted Provision of Material Support to ISIS, one count of Receipt of Military-Type Training from ISIS in violation of § 2339D(a), and one count of Obstruction of Justice in violation of § 1512. He was found guilty by jury verdict for all five counts of the indictment. He served as an ISIS sniper and fought in several battles on behalf of ISIS. He was involved in training other ISIS members. At trial, he maintained his allegiance to ISIS to court personnel and stated ISIS would rise again. Mr. Asainov did not cooperate with the U.S. government. |
| Warren Christopher Clark | 19-CR-2 (Southern District of Texas) | 10 Years | Mr. Clark was sentenced on February 8, 2024, after pleading guilty to Receiving Military-Type Training from a Foreign Terrorist Organization in violation of 18 U.S.C. §§ 2330D and 3238. He traveled to |

| | | | |
|---|---|---|---|
| | | | Syria in 2015 and received religious and military training. He was ultimately captured in 2019, and the extent of Mr. Warren's cooperation with the U.S. government is unknown, and the documents are sealed. |
| Samantha Marie Elhassani | 19-CR-159 (Eastern District of Virginia) | 6.5 Years | Ms. Elhassanni was sentenced on November 12, 2020, after pleading guilty to Financing of Terrorism and Aiding and Abetting in violation of 18 U.S.C. § 2339C. She made multiple trips to Hong Kong and transported more than $30,000 in cash and gold from the U.S to help her husband and his brother join and finance ISIS. |
| Allison Fluke-Ekren | 22-CR-92 (Eastern District of Virginia | 20 Years | Ms. Fluke-Ekren was sentenced on November 1, 2022, after pleading guilty to Conspiracy to Provide Material Support to ISIS in violation of 18 U.S.C. § 2339B. She served as a leader and organizer of a military battalion that trained women and girls how to use assault rifles, grenades, and suicide vests for attacks in Syria and other countries, including attacks on universities. It does not appear Ms. Fluke-Ekren cooperated with the government. |
| Ahmad Khalil Elshazly | 20-CR-71 (District of Connecticut) | Not Yet Sentenced. | Mr. Elshazly pleaded guilty on November 30, 2022 to knowingly attempting to provide material support or resources to work under the terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization, in violation of 18 U.S. § 2339B(h). He pledged allegiance to the terrorist organization and its leadership in online messages and paid $500 to a person he believed was an ISIS facilitator who would be able to smuggle |

| | | | him to Turkey and connect him with ISIS members that would assist him in traveling to Syria. He was arrested in Connecticut as he planned to begin his travels. |
|---|---|---|---|
| Mohamad Jamal Khweis | 16-CR-143 (Eastern District of Virginia) | 20 Years | Mr. Khweis was found guilty by jury trial on all three counts of the indictment and sentenced on June 28, 2022, for Conspiracy to Provide Material Support to ISIS in violation of 18 U.S.C. § 2339B, Providing and Attempting to Provide Material Support to ISIS also in violation of 18 U.S.C. § 2339B, and Possessing Firearms in Furtherance of a Crime of Violence in violation of 18 U.S.C. § 924(c). Mr. Khweis joined ISIS in December of 2015 and served as a soldier for ISIS for two and a half months. In that time, he also volunteered to be a suicide bomber but was ultimately captured by Kurdish forces in Iraq in March of 2016. |
| Ibraheem Izzy Musaibli | 18-CR-20495 (Eastern District of Michigan) | 14 Years | Mr. Musaibli was found guilty by jury trial for Providing and Attempting to Provide Material Support to ISIS also in violation of 18 U.S.C. § 2339B and sentenced June 15, 2023. Mr. Musaibli spent at least nine months fighting for ISIS on the front lines and admitted to using his weapon while serving ISIS. |
| Sinmyah Ceaser | 19-CR-117 and 17-CR-48 (Eastern District of NY) | 4 years, Resent. on 4.9.2025 to 230 months. | Pled guilty to providing material support to ISIS. While on Pretrial Release, Ceaser continued to contact ISIS members. She pled guilty to obstruction of justice and faced 360 to 600 years in prison. She was sentenced to 48-months. Her offense conduct included using social media to |

| | | | |
|---|---|---|---|
| | | | recruit and connect people in the US with ISIS members. She was arrested at JFK airport on her way to join ISIS. |
| Benjamin Ryan Teeter & Michael Solomon | 20-CR-193 (District of MN) | 4 years | Defendants believed they were in contact with members of Hamas to buy weapons. They planned on attacking a federal courthouse in Minnesota. Both cooperated |
| Awais Chudhary | 20-CR-135 (E. District of New York) | 9 years | Chudhary sought out and distributed ISIS propaganda over social media and helped ISIS target English-speaking recruits on the internet. Chudhary planned to commit a knife attack in support of ISIS at the World's Fair Marina in Queens, New York, and provided video footage and photos of the target location to an undercover officer. He pleaded guilty to harboring or concealing terrorists and was sentenced to 108 months' imprisonment. |
| Abdelhamid Al-Madioum | 20-196 (District of MN) | 10 years, resent. to time served. | In 2015, Al-Madioum left a family vacation in Morocco and traveled to Syria to join ISIS. He served as a soldier for ISIS until he was injured. In 2019, he surrendered to Syrian Democratic Forces. He pleaded guilty to one count of providing and attempting to provide material support to a designated foreign terrorist organization. He was sentenced to 120 months' imprisonment on June 13, 2024. Throughout his case and time in custody of the Bureau of Prisons, Al-Madioum cooperated. He was resentenced on June 17, 2025 to time served. |

Taking the facts from the table above into consideration, the facts surrounding Mr. Hassan's case are most comparable with those who received

shorter sentences, and his circumstances are notably different from those who received longer sentences.

The first factor to note is the extent to which Mr. Hassan provided support to ISIS. He did not recruit others. He did not complete travel. He did not attempt to go through other countries to complete his travel. He did not receive weapons training. He did not send money or other items overseas. He has no prior criminal history or history of violence. He did not know others in ISIS such that he could have cooperated, but showed remorse by pleading guilty. A downward variance is appropriate to avoid sentencing disparities when comparing the severity of conduct to other defendants above.

Mr. Hassan has also accepted responsibility by pleading guilty. Mr. Hassan recognizes there is no one to blame for his actions but himself, and he is remorseful and apologetic to both the U.S. government as well as his family for what he has put them through.

Mr. Hassan would like to help other young Muslim men that get caught up on social media. He feels that, when he was being recruited, someone like himself would have been the most beneficial person to talk to because he knows all of ISIS's recruitment tricks. He can relate to other young Muslim Americans who are being subjected to extremist versions of their religion.

The above cases are related to Providing Material Support. However, as noted earlier, the government argued at the Mr. Hassan's detention hearing that he was dangerous because of the damage he could do on U.S. soil. In *United States v. Ivan Hunter*, (20-193) Hunter was member of a rightwing extremist group called Boogaloo Bois. The group preached a second civil war, violence, and killing of government officials. Members planned to kidnap Michigan governor Gretchen Whitmer. Hunter traveled from Texas to Minnesota in 2020 and admitted to firing 13 rounds from an assault rifle on the 3rd Precinct police station while there were people inside the building. When Hunter was arrested, many weapons and body armor were found in his car. He was sentenced to 60-months after pleading to a federal riot charge. Similarly, member Michael Robert Solomon (20-193 MJD) pled guilty to a plot to cause civil arrest and selling firearm parts to who he believed were Hamas members. He was sentenced to 3 years (with cooperation). Benjamin Teeter (20-193 (2) MJD) was recruited by Solomon, and traveled to Minnesota from North Carolina. He pled guilty to conspiracy to provide material support to Hamas. Both Solomon and Teeter were recorded expressing anti-US government views, expressing themselves as mercenaries for Hamas, and seen carrying weapons. Teeter was sentenced to four years. A fourth defendant, Michael Dahlager was sentenced to two years after expressing a willingness to kill police.

Although hard to find on public records, counsel found the following additional cases that involve weapon use and damage to property.

| Michael Allen Francisco | 24-158 (ADM/DTS) | 5 years | On November 20, 2022, Francisco placed an explosive device on the window of a salon in Minneapolis and fled the scene as the device detonated. He returned to the salon one year later and vandalized the business by throwing a landscaping rock through the window. A search warrant of Francisco's home resulted in the seizure of multiple explosive components, firearms and ammunition, and methamphetamine. He pleaded guilty to Malicious Use of Explosive Materials. |
|---|---|---|---|
| Dylan Raymond Orr | 22-202 (NEB/DTS) | 2.5 years | A lost cellphone believed to belong to the defendant was turned into the Savage Police Department. Text messages on the phone contained images of pipe bombs, and blueprints and information related to building and assembling pipe bombs. A search of Orr's residence revealed a bag of explosive powder, pipe casings, and endcaps. Orr pleaded guilty to Possession of Unregistered Destructive Device. |
| Eric James Reinbold | 18-40 (JRT/LIB) | 5 years | Family members of Reinold were hunting in Oklee, Minnesota when a family member located a plastic tote that contained numerous pipe bombs, and plastic bags containing gunpowder and wires. A search warrant was executed and law enforcement located additional pipe bomb parts and writings related to making homemade explosives. Reinbold was convicted by a jury of Possession of Unregistered Destructive Devices and |

| | | | was sentenced to 60 months' imprisonment. |
|---|---|---|---|
| Chad Lee Monson | 18-136 (JNE/HB) | 3 years | Law enforcement executed a search warrant at Monson's home where they located 16 firearms, a large amount of ammunition, and illegal narcotics. A commercial utility building connected to Monson was also searched where police found 10 machine guns without serial numbers, three pipe bombs, and three unregistered silencers. Monson pleaded guilty to possession of machine guns, possession of unregistered destructive devices, and possession of unregistered silencers. |
| John Gardner Jene White | 02-235 (JNE) | 5 years 5 years | Gardner and White assembled and planted a homemade explosive device in a underground fuel-storage tank at a Rochester, Minnesota service station. A friend of the defendants was told of the plan and reported it to law enforcement. A fuel delivery person discovered the bomb. The defendants pleaded guilty to aiding and abetting attempted destruction of property in interstate commerce. |

These cases are noted because it shows the actual possession of bombs, firearms, and destructive devices by some individuals who wanted to cause harm in the United States. Mr. Hassan liked and commented on such individuals, but he never had a bomb or an explosive device. At the most, he had a knife, a knife that was used for his work, on his lap while driving with the ISIS flag.

39

Again, comparing Mr. Hassan's offense conduct, a sentence of five years in prison is justified and warrant. He is requesting supervision to follow.

## LENTGH OF SUPERVISION TERM

A term of supervision of up to life can be imposed pursuant to 18 U.S.C. § 3583(j). Mr. Hassan is requesting a term of 10 years of supervision to follow his imprisonment.  To pinpoint the appropriate Supervised Release term a sentencing court is called upon to consider a number of the traditional sentencing factors. 18 U.S.C. § 3583(c). Specifically:

- Nature/circumstances of offense, and history/characteristics of the defendant;

- Need to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

- Need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

- Need to provide restitution to any victims of the offense.

18 U.S.C. § 3583(c) (incorporating select provisions of § 3553(a)); USSG § 5D1.2, App. N. 4 (incorporating USSG § 5D1.1, App. N. 3)).

"The court should give particular consideration to the defendant's criminal history (which is one aspect of the 'history and characteristics of the defendant' ** above). In general, the more serious the defendant's criminal history, the greater the need for supervised release." USSG § 5D1.1, App. N. 3(B). And by logical

40

extension, under that same Guidelines policy rationale, a defendant with less serious criminal history has lesser need for supervision. *See id.*

Mr. Hassan's offense conduct was limited to December 2024 through February 2025. Since that time, he has worked to rehabilitated himself. This has been accomplished by his self-education, therapy, and the continued support of his family. However, he will benefit from the services of the United States Probation Office. Mr. Hassan is in need of mental health therapy; and after being in federal prison, he will need time to adjust to his community; he will need job training; he will need assistance in obtaining current identification; and medical treatment. A ten-year term of supervision will be able to address those concerns and will continue to assure the safety of the community. Counsel reviewed the suggested conditions of supervision and notes no objections.

### RECOMMENDATIONS TO THE BOP

Mr. Hassan is requesting that the Court recommend to the Bureau of Prisons that he be housed at FCI Sandstone to allow him to be close to family. He would also like the Court to recommend mental health therapy.

## CONCLUSION

Respectfully, Mr. Hassan asks this Court to sentence him to serve five years in Federal Prison followed by a ten-year term of supervision. He has made mental growth since his offense. He has educated himself on the wrongs of ISIS ideology. He has acknowledged and welcomed mental health therapy. He is willing to discuss his experience so others will not take his path. Comparing him to others who have supplied material support also supports a sentence of five years in prison. His letter to Court is very telling of his mindset today and again, the letter supports a sentence of five years in prison.

Dated:          April 16, 2026              Respectfully submitted,

                                            *s/ Manny K. Atwal*

                                            Manny K. Atwal
                                            Attorney ID No. 282029
                                            James Becker
                                            Attorney ID No. 388222
                                            Attorneys for Mr. Hassan
                                            107 U.S. Courthouse
                                            300 South Fourth Street
                                            Minneapolis, MN 55415